**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States,<br>　　　　　　Plaintiff,<br>v.<br>Jesus Antonio Espinoza-Garcia,<br>　　aka, Jose Antonio Lopez-Natal,<br>　　　　　　Defendant. | No. CR 08-1272-TUC-DCB (JM)<br><br>**REPORT AND<br>RECOMMENDATION** |

Pursuant to Minute Entry Order dated September 22, 2008, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters. On March 3, 2009, Defendant filed a motion to Suppress Statements (Docket No. 39). The Motion was heard by Magistrate Judge Marshall on April 27, 2009. Defendant was present and represented by counsel. Two witnesses were presented by the Government, Officer Urena and Officer Vasquez. Defendant testified on his own behalf. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that the District Court DENY Defendant's Motion to Suppress Statements.[1]

**I.    FINDINGS OF FACT**

　　A.    Defendant's Testimony

Defendant testified that on September 17, 2008 at 10:00 a.m., he attempted to enter the United States and when asked for identification, showed an Arizona identification card in the name of "Jose Antonio Lopez Natal." (Tr. 82, 100, Ex. 5)[2] The port of entry officer

---

[1] Trial in this matter is scheduled for June 9, 2009.

[2] The transcript of the April 27, 2009, proceedings is designated "Tr." followed by the page number where the cited testimony appears.

1 swiped the card through the computer and the Defendant was taken and locked in a little
2 room with three other people. (Tr. 83, 103.) The room had windows through which he could
3 see cars being inspected. (*Id.*)

4 After about an hour, a woman officer took the Defendant upstairs where he was
5 fingerprinted (not by either of the two officers who testified) and taken to a waiting area with
6 tables and benches. (Tr. 83, 85, 104.)[3]  After another hour, he was placed in an enclosed
7 cage like area. (Tr. 85.)  After 20 minutes, he began to feel sick. (Tr. 86.)  He was
8 trembling, shaking, felt nervous and his heart was beating very fast. (Tr. 86, 105.)  He was
9 taken to the hospital by ambulance accompanied by an immigration officer. (Tr. 86.)  At the
10 hospital, he was given pills for high blood pressure and a prescription to take with him. (*Id.*)
11 He was at the hospital for about two hours and was then taken back to immigration at 2:30
12 or 3:00 in the afternoon. (Tr. 87, 106.)  Defendant was handcuffed the entire time on his way
13 to the hospital in the ambulance, at the hospital, and on the way back to immigration in the
14 ambulance. (Tr. 88.)

15 Upon his return, Defendant was again placed in the caged area where he remained for
16 a half hour to an hour. (*Id.*)  He was still not feeling well; his blood pressure has high and
17 he kept asking for another pill but none was given to him. (Tr. 89, 111.)  When questioned
18 by the Court, the Defendant admitted that he had never before been seen by a doctor for this
19 condition and it was when he got nervous on this occasion that he first realized he suffered
20 from high blood pressure. (Tr. 121.)  When asked about the pills he was given at the
21 hospital, the Defendant stated that he was told by the hospital doctor that he needed to take
22 the next pill in 6 to 8 hours in order to keep his blood pressure stable. (Tr. 122.)

23 According to the Defendant, when he returned from the hospital, three agents spoke
24 with him, Officer Urena, Officer Vasquez and one other officer who did not testify at the

---

[3] Upon questioning by the Court, the Defendant testified that he had previously been arrested and fingerprinted under his true name of Espinoza-Garcia. (Tr. 123.) Presumably, the officers suspected that the Defendant was not Lopez-Natal after the first set of fingerprints were taken.

2

1 hearing. (Tr. 88, 90.) The Defendant told the officers that he could prove his citizenship
2 with his Puerto Rico birth certificate and that if he were allowed to call his wife, she could
3 bring it. (Tr. 91, 111.) The Defendant claims that Officer Urena made fun of him and
4 mocked him about being Puerto Rican, but did let the Defendant call his wife to bring the
5 birth certificate to the port of entry. (Tr. 89-90, 111.) Defendant's wife did in fact bring a
6 Puerto Rico birth certificate under the name of "Jose Antonio Lopez Natal." (Tr. 112, Ex.
7 4.)[4] His wife was allowed to go into the caged area where she cried and told the Defendant
8 that she had been told he "would get a lot of years if [he] didn't say who [he] was." (Tr.
9 91:23-24.)

10 After the Defendant's wife left, Agent Urena took the Defendant over to his desk, read
11 him his *Miranda* rights in Spanish and had the Defendant sign the advise of rights. (Tr. 114;
12 Ex. 1.) According to the Defendant, Officer Urena promised him that if he would just say
13 he was "Jesus Espinoza," he could be deported right away. (Tr. 92.) Based on that promise,
14 the Defendant admitted his identity and that he had illegally reentered the country. (Tr. 95.)
15 According to the Defendant, Officer Urena recorded the statement on a small, square tape
16 recorder. (Tr.93.) The interrogation with Officer Urena ended at 9:00 or 9:30. (Tr. 94.)
17 Defendant was not handcuffed while Officer Urena questioned him. (Tr. 95.)

18 At approximately 10:30 or 11:00 p.m., Officer Vasquez arrived, went over the
19 questions and answers again with the Defendant, in Spanish, and asked if he would sign
20 "some papers." (Tr. 93, 94:5, 119.) At first, he refused to sign (Ex. 2) but did sign after
21 Officer Vasquez told him that he would be released to Mexico if he signed them. (Tr. 94.)
22 The Defendant signed a typed written sworn statement in English. (Ex. 3; Tr. 121.) Officer

---

[4]On cross examination, Defendant testified that his true name is "Jesus Antonio Espinoza-Garcia" (Tr. 99), that the Puerto Rico birth certificate in the name of "Jose Antonio Lopez Natal" was not his, and that he had purchased it from someone in Mexico. (Tr. 112-113.) He also admitted that he provided the (false) name of Lopez Natal to the Court at his initial appearance in the current case. (Tr. 99.)

3

1 Vasquez left at about 11:30. (Tr. 95.) Defendant was not handcuffed while questioned by
2 Officer Vasquez. (*Id.*)

### B. Officer Urena's Testimony

Officer Urena testified that he has been in law enforcement for over ten years. (Tr. 11.) On September 17, 2008, he was stationed in Nogales, Arizona, working as a Custom and Border Protection Officer. (Tr. 11, 45.)[5] He first interacted with the Defendant in his office in the passport control unit when the Defendant had just returned from the hospital. (Tr. 13.) According to Officer Urena, the Defendant's demeanor seemed normal and he did not complain that he was in pain or not feeling okay. (Tr. 124-125.) Officer Urena was not advised by anybody that the Defendant had a medical condition that prevented him from answering any questions. (*Id.*) The Defendant did complain that he was a U.S. citizen and did not know why he was being detained. (Tr. 13.) The investigation into the Defendant's citizenship was administrative at this point and Officer Urena was trying to verify the Defendant's claim of U.S. citizenship. (Tr. 28.) The Defendant kept insisting that he was a U.S. citizen and asked to call his wife so she could bring his birth certificate to prove it. (Tr. 28, 31.) Officer Urena placed a call to the wife and she brought a birth certificate from Puerto Rico. (Tr. 28, 31, Ex. 4.)

Officer Urena denied mocking the Defendant or making fun of his claim that he was from Puerto Rico. (Tr. 126.) He denied owning a tape recording device much less taping the Defendant's statements. (Tr. 128.) Most important, Officer Urena denied promising the Defendant that if he provided his true name of Espinoza-Garcia, he would not be put in jail but instead, would just be deported. (Tr. 126-127.) According to Officer Urena, the Defendant wanted to know what options there were and Officer Urena explained the

---

[5]Apparently, when Officer Urena arrived to work that day, the Defendant had already been referred to secondary inspection. (Tr. 67.) Officer Urena testified that in conjunction with a picture I.D., a person is required to present a birth certificate to prove U.S. citizenship. He surmised that since the Defendant only had a state I.D., and the officers didn't believe him, he was brought upstairs for fingerprinting. (*Id.*)

4

processes that the case could take, administrative, such as expedited removal or criminal. (*Id.*) Officer Urena told the Defendant that ultimately it would be up to his supervisor to decide how the case was handled. (*Id.*)

After he had all the information (Defendant's purported birth certificate, fingerprints, FBI records and immigration apprehension and arrests), Officer Urena provided the information to his supervisor and a decision was made that the case would go criminal. (Tr. 14-15.)

At 2:20 or 2:30 p.m., Officer Urena read the Defendant his *Miranda* rights in Spanish. (Tr. 13, 15, 45.) He also let the Defendant read the rights off a form and then asked him if he understood. (Tr. 17.) The Defendant stated that he did and signed the advise of rights form. (Tr.18, Ex. 1.) During this time, Defendant was sitting next to the officer's desk in a chair in an open space room with three desks. (Tr. 15, 63.) There were two other field officers in the room. (*Id.*) When not in the larger room, Defendant was in a 12 by 12 holding area within that room. (Tr. 36, 37 62.) The room was made out of wire and contained chairs for the detainees. (*Id.*)

At 6:30 p.m., Officer Urena questioned the Defendant in a question and answer series, typing the Defendant's answers into the computer as the Defendant sat next to him. (Tr. 20-23, 45.) Because Officer Urena's shift was ending, he did not go over the statement with the Defendant or get his signature. (Tr. 25.)

C. <u>Officer Vasquez' Testimony</u>

Officer Vasquez testified that she has been a Customs and Border Protection Officer at the Nogales port of entry for four and a half years. (Tr. 68.) She came on duty and finished taking the Defendant's statement after Officer Urena left. (Tr. 68-69, 77.) The Defendant appeared fine; not nervous, not frightened and not as though he didn't know what he was doing. (Tr. 136.) At no time did the Defendant mention to Officer Vasquez that any other officer had told him he would be deported if he made an admission; at no time did she make him any promises. (*Id.*)

Officer Vasquez reviewed the Defendant's sworn statement with him by going through the questions that Officer Urena had asked and the answers that the Defendant had given. (Tr. 71.) She did this in Spanish. (*Id*.) The Defendant agreed to all of the questions and answers that were provided in the statement. (Tr. 137- 138.) He never objected to any of them. *(Id*.) Nor did he change any of his answers. (Tr. 71.) When Officer Vasquez first presented the statement to the Defendant and asked him to initial it, he refused. (Tr. 72, Ex. 2.) Officer Vasquez told the Defendant that he didn't have to sign but that since they were his answers they would nonetheless go into the file. (Tr. 73.) Officer Vasquez informed her supervisor about the Defendant's refusal to sign and the officer was instructed to note the Defendant's refusal on every page of the statement. (*Id*.) After noting the refusal on the first page, the Defendant changed his mind and said he would sign. (*Id*.) He signed page 8 of the 8-page statement and initialed the bottom right hand corner of the first 7 pages. (Tr. 74, Ex. 3.) Combined with the time Officer Urena questioned the Defendant, the total length of questioning was from 6:00 p.m. to 12 midnight. (Tr. 78.)

## II. CONCLUSIONS OF LAW

### A. Miranda

"A person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

#### 1. First Statement

Arguably, when the Defendant was detained at the secondary inspection (before Officer Urena advised him of his rights), he was deprived of his freedom in a significant way and was therefore "in custody" for *Miranda* purposes. *But see United States v. Luther*, 521 F.2d 408, 410 (9th Cir. 1975) (temporary detention at port of entry held not custodial but only

1 an administrative seizure where keys to car held pending an identification check but physical surroundings were a public counter and person told she was free to go)). However, the "special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

Here, there was no "interrogation." At primary inspection, the Defendant was asked about his citizenship. He provided only an Arizona I.D., but not the required I.D. *and* birth certificate. This prompted further detention so he was taken to secondary inspection and fingerprinted. Presumably, since he had a prior record under another name, the fingerprint check showed a discrepancy in identity and he was detained further. The seizure was administrative but even if criminal as argued by the defense, the Defendant was not subject to questioning. By the Defendant's own admission, *he* initiated the conversation with Officer Urena by insisting that he could prove his citizenship with his Puerto Rico birth certificate and if he were allowed to call his wife, she could bring it. (Tr. 91, 111.)

### 2. Sworn Written Statement

It is undisputed that by 2:20 or 2:30 p.m., Defendant was in custody and was informed of his *Miranda* rights. Officer Urena testified that he read the Defendant his *Miranda* rights in Spanish. (Tr. 13, 15, 45.) He also let the Defendant read the rights off a form and then asked him if he understood. (Tr. 17.) As such, the issue is not whether he was informed of his rights, but whether he waived them voluntarily and otherwise provided his statement voluntarily.

### B. Voluntariness

The inquiry into the voluntariness of a confession is the same as the inquiry into the voluntariness of a waiver of *Miranda* rights. *Derrick v. Peterson,* 924 F.2d 813, 820 (9th Cir.1990). Only voluntary confessions are admissible. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). The government must prove voluntariness of a confession by a preponderance of the evidence. *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994). "In evaluating

voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted).  The totality of the circumstances include: the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health.  *Taylor v. Maddox*, 366 F23. 992, 1016 (9th Cir. 2004).

Psychological coercion is equally likely to result in involuntary statements and is just as forbidden as violent or physical interrogation tactics. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991).  A confession is not free and voluntary if "obtained by any direct or implied promises, however slight. Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 347-48 (1963).

        1.      <u>Credibility Assessment</u>

On several significant points, Defendant's testimony varied from that of Officer Urena and Officer Vasquez.  If the facts are as the officers recall, then the Defendant's confession was voluntary and if they are as the Defendant testified, then it was not.  Thus, the outcome of the motion is based almost entirely on a credibility determination.

Defendant claims that Officer Urena outright promised him that if he said his name was "Jesus Espinoza," he would be deported right away. Officer Urena recalls telling the Defendant what options were available to the government-administrative, such as expedited removal, or criminal.  He also told the Defendant that the decision was up to his supervisor to make.  In fact, that is exactly what happened. Officer Urena presented the investigative materials to his supervisor (the birth certificate, the fingerprints, and the FBI and immigration apprehension and arrest record).  After review, the supervisor decided that the case would go criminal.

Defendant also claims that Officer Vasquez promised him that if he signed the typed statement, he would be released to Mexico. Officer Vasquez denies making that promise. Defendant testified that Officer Urena mocked him about being from Puerto Rico; Officer Urena denies doing so. Defendant claims that Officer Urena taped his statement with a small square tape recorder. Officer Urena denies taping the confession or even having seen such a device at his center.

Without any corroborating evidence to support the Defendant's contradictory account of events, this Court cannot find him credible. By his own testimony, the Defendant admitted to producing a false I.D. to a federal officer at the port of entry, to purchasing a false birth certificate from someone in Mexico and providing it to another federal officer at secondary inspection, and to providing a false name to a judicial officer at his initial appearance. By contrast, Officer Vasquez and Officer Urena have been law enforcement officers for over four years and over ten years, respectively. They testified consistently on all major points. The Court's credibility assessment favors the officers.

## 2. Totality of Remaining Circumstances

Defendant argues that his confession was not voluntary because of the extremely long period of questioning. According to the record, the Defendant was questioned by either Officer Urena or Officer Vasquez from 6:00 p.m. to 12:00 midnight. The Court finds that six hours of questioning, even if those six hours were uninterrupted and the record is silent on this, was not excessively long. *Compare Doody v. Schriro*, 548 F.2d 847, 867 (9th Cir. 2008) (confession not voluntary where 17-year old was interrogated for more than 12 unbroken hours embracing an entire night).

The defense impliedly argues that the fact that Defendant's visibly upset wife was allowed into the caged area with the Defendant somehow exploited his psychological vulnerabilities and compelled him to confess. The record does not support this conclusion. It was upon the Defendant's insistence that Officer Urena placed the call to the Defendant's wife. It was upon the direction of the Defendant that Officer Urena allowed the Defendant's

9

wife to deliver the birth certificate. Further detracting from a coercive environment was Officer Urena's decent act of allowing the Defendant to see his wife during his detention.

Finally, Defendant argues that his statement was not voluntary because he was not feeling well and was not given his medication. When the Defendant first registered his complaints relating to his high blood pressure, law enforcement officers took the symptoms seriously, they called paramedics and the Defendant was transported by ambulance to the hospital where he was treated, released and transported back. Officer Urena first encountered the Defendant after he returned from the hospital. Had the Defendant's medical complaints been serious enough, it is likely that Officer Urena would have been warned of any lingering problems. He was not. According to Officer Urena, he appeared fine. Officer Vasquez also testified that the Defendant did not appear to be nervous or frightened but acted as though he knew what he was doing.

If one follows the time line provided by the Defendant when he testified, he was taken to the hospital at 12:20 p.m. and was taken back to the holding area at 2:30 or 3:00 p.m. Assuming he was given a blood pressure pill shortly before leaving the hospital and had to take another pill in six to eight hours, he would have had to take another pill between 8:00 and 10:00 p.m. in order to keep his blood pressure stable. But he was not given another pill. Yet, the Defendant gave his statement to Officer Urena at 9:00 or 9:30 p.m. without complaining about of pain or discomfort. And he reviewed and signed his statement with Officer Vasquez at 11:30 p.m. without incident. The Court finds that the Defendant was not suffering from such acute physical pain so as to make his confession involuntary. *See United States v. Walker*, 272 F.3d 407, 413-414 (7th Cir. 2001) (confession voluntary where although the defendant was suffering some physical discomfort, he was alert and oriented when discharged from the hospital).

Under the circumstances presented by this case, the Government has fulfilled its burden to prove Defendant's statement was voluntary by a preponderance of the evidence under the totality of the circumstances.

**III.     RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE**

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant's Motion to Suppress Statements. (Docket No. 39).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CR 08-1272 TUC-DCB**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 14th day of May, 2009.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge